IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

VICKIE D. BROOKS,                                        )
                                                        )
              Plaintiff,                                )
                                                        ) CASE NO. 2:09-CV-384-WKW [WO]
       v.                                               )
                                                        )
HYUNDAI MOTOR MANUFACTURING                             )
ALABAMA, LLC,                                           )
                                                        )
              Defendant.                                )

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Plaintiff Vicki D. Brooks ("Brooks") brings this lawsuit against her former employer, alleging that she was terminated and subjected to a hostile work environment on the basis of her race, African-American.  She brings her claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"), and 42 U.S.C. § 1981.  Before the court is a motion for summary judgment (Doc. # 14), filed by Defendant Hyundai Motor Manufacturing Alabama, LLC ("HMMA").  The motion is accompanied by a brief and an evidentiary submission.  (Docs. # 15, 16.)  Ms. Brooks filed a response in opposition (Doc. # 20) and an evidentiary submission (Doc. # 21).  HMMA filed a reply.  (Doc. # 22.)  After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that HMMA's motion for summary judgment is due to be granted.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).  Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation and internal quotation marks omitted); *see* Fed. R. Civ. P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

2

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists.  Fed. R. Civ. P. 56(e)(2); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (citation and internal quotation marks omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 242 (citations omitted).  "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

3

(1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment."). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex Corp.*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

## IV.  FACTS

The material facts, viewed in the light most favorable to Ms. Brooks, are as follows. Ms. Brooks was employed full-time by HMMA at its Montgomery, Alabama automobile manufacturing plant from July 11, 2005, to June 14, 2006, when she was fired. During her eleven-month tenure at HMMA, Ms. Brooks worked in the production control department

as a team member, an hourly-paid job.  In this position, she was responsible for replenishing parts to be assembled on the engines on the assembly line and the decking line in HMMA's Lambda engine shop.  (Pl. Dep. 52-54.)

Jason Gunn ("Gunn"), a Caucasian male, was a team leader in the production control department where Ms. Brooks worked.  Team leaders provide "general guidance" to team members and "collect time sheets"; however, they are not in HMMA's designated managerial hierarchy.  (Marty Blame Decl. ¶ 4.)  They are hourly, non-exempt employees, who lack authority to promote, discipline or terminate a team member, or to approve full or partial absences from a shift.  (Blame Decl. ¶ 4; Akers Decl. ¶ 3.)

Ms. Brooks's description of Mr. Gunn's conduct is not flattering.  He was "messing with [her] all the time" and "mistreating" her.  (Pl. Dep. 70, 76.)  He would not give her freebies that HMMA passed out to its employees from time to time, such as meal cards or soft drinks.  (Pl. Dep. 70-71.)  He also withheld from her certain employment paperwork (Pl. Dep. 70-71), and generally would "holler[]" and "scream[]" about her work performance (Pl. Dep. 97).  Worse, he uttered offensive racial epithets in her presence "more than one time" during her eleven-month employment.  (Pl. Dep. 76.)  She did not know "how many total times," or if it was more than five times, that Mr. Gunn made racial slurs.  (Pl. Dep. 78.)  Ms. Brooks, however, recalled two specific incidents, both of which were similar in nature.  On one occasion, Ms. Brooks was on the decking line and informed Mr. Gunn that she needed a particular part.  Mr. Gunn became upset and got "in [her] face," saying "Black folks, I tell you," and "niggers," implying, Mr. Brooks felt, that she did not have "good sense" and that

5

she always did "something wrong."  (Pl. Dep. 74, 76, 90, 198.)  On the other occasion, when Ms. Brooks was "stocking [the] line," Mr. Gunn uttered "nigger" in response to Ms. Brooks's request for "more wiring harness[es]," and Ms. Brooks, as well as an African-American co-employee, heard it.  (Pl. Dep. 104-06.)  Once Ms. Brooks asked Mr. Gunn why he was making derogatory racial comments, but he "just walked off."  (Pl. Dep. 96.)

Ms. Brooks is not clear when Mr. Gunn's racially offensive epithets began or precisely when the two incidents occurred.  In her charge filed with the Equal Employment Opportunity Commission ("EEOC"), Ms. Brooks recounts that Mr. Gunn's name calling commenced "[a]round March 2006."  (EEOC Charge (Ex. 10 to Pl. Dep.).)  In deposition testimony, she indicates that the "first of the year" in 2006, she reported Mr. Gunn's "slur words" to "Euel" (last name unknown) in the team relations department,[1] but later said that she was not "sure" if the epithets actually began prior to March 2006.  (Pl. Dep. 77, 92.) Euel no longer works at HMMA.  He was succeeded by Marty Blame ("Blame"), who has held the position since March 2006.  (Blame Decl. ¶ 2.)

After Ms. Brooks complained about Mr. Gunn's use of racial epithets to Mr. Blame's predecessor, he told Ms. Brooks that he had talked to Mr. Gunn and that she should not have any "more problems."  (Pl. Dep. 69-74, 77-80, 88-90, 102.)  However, Mr. Gunn did not

---

[1] HMMA's team relations department assists team members with employment issues, provides training to team members and new hires on policies and procedures, makes recommendations to management on corrective action, and investigates work-rule violations and claims of discrimination. (Audie Swegman Decl. ¶ 2.)  It appears that voicing a complaint of racial harassment to a member of the team relations department complies with HMMA's Harassment Policy.  (Harassment Policy § 2 (Pl. Ex. 2 to Doc. # 21).)  No contrary argument has been made.

6

stop.  (Pl. Dep. 80.)  Thus, at some point later, Ms. Brooks reported Mr. Gunn's comments to Mr. Blame.  (Pl. Dep. 74.)  Mr. Blame responded that he would "check into it."  (Pl. Dep. 74.)  Later, Mr. Blame informed Ms. Brooks that he had directed Mr. Gunn to apologize to her, but he never did.  (Pl. Dep. 74, 80, 88-90.)  This evidence forms the basis of Ms. Brooks's racially hostile work environment claim.  (*See* Pl. Dep. 170 (testifying that "[n]obody but Jason [Gunn]" subjected her to racially harassing behavior).)

Ms. Brooks also contends that she was fired based upon her race.  HMMA, on the other hand, says she was fired for violating its Attendance Policy.  This policy provides that "[r]egular attendance is the cornerstone for the success of HMMA.  A Team Member's absenteeism can reduce the quality and affect . . . the overall efficiency of HMMA operations, as well as caus[e] a hardship on fellow Team Members who report to work regularly."  (Attendance Policy (Ex. 1 to Swegman Decl.).)

The Attendance Policy distinguishes between leaving a shift early with proper permission and leaving a shift early without proper permission.  As to the former, "Team Members who leave prior to the end of their scheduled shift (including overtime hours) with their group leader's and/or manager's permission are considered to have left early.  A Leave Early will be considered as one-half day of absence for purposes of attendance calculation." (Attendance Policy § 4.4.)  As to the latter,

> [a]ny situation where a Team Member leaves the facility during scheduled work time (includ[ing] overtime whether scheduled or voluntary) without [his or her] group leader, manager, senior manager, or any other member of management's authorization, the Team Member will be considered to have voluntarily resigned from his/her employment at HMMA.

7

(Attendance Policy § 4.4.1; *see also* Blame Aff. ¶ 4 (confirming job abandonment policy).) Within the HMMA organization, a group leader is the lowest level of management.  Above the group leader, there are assistant managers, managers and senior managers.  A team leader, the position held by Mr. Gunn, is not listed as one of the individuals from whom permission to leave a shift early can be attained.

It is undisputed that Ms. Brooks participated in an orientation when hired, that she received a Team Member Handbook, and that she read the handbook.  (Pl. Dep. 44-52; Swegman Decl. ¶ 2; Acknowledgment of Receipt of Team Member Handbook, signed & dated by Ms. Brooks (Ex. 7 to Pl. Dep.); HMMA Training Attendance Sheet (Ex. 6 to Pl. Dep.).)  The Attendance Policy set out in the Team Member Handbook includes verbatim § 4.4 and § 4.4.1, above.[2]  (Team Member Handbook 8 (Ex. 8 to Pl. Dep.).)

The facts surrounding Ms. Brooks's termination went like this.  On June 7, 2006, Ms. Brooks was working on the second shift, which generally operates from 6:15 p.m. until 3:00 a.m.  On June 7, the on-duty Assistant Manager (Derik Akers) required the production control team members, which included Ms. Brooks, to work overtime up to one hour for the purpose of conducting inventory checks and "stock[ing] the line." (Pl. Dep. 161; Akers Decl. ¶ 3.)  Scheduled overtime, resulting in shifts up to ten hours, was not uncommon during this

---

[2] The Team Member Handbook contains a summary of HMMA's policies, including those on attendance, overtime, and anti-discrimination.  (Team Member Handbook 2-3, 7-10.)  The Attendance Policy also is set forth in a self-contained document.

time period based upon high production demands.[3]  (Akers Decl. ¶ 2; *see also* Pl. Dep. 128

("We worked . . . nine, sometimes eight, sometimes ten [hours]" on a shift.); Pl. Dep. 163 (It

"wasn't unusual" to work a ten-hour shift.).)

Mr. Gunn informed the team members in production control, including Ms. Brooks,

of the overtime requirement.  (Pl. Dep. 127-32, 137, 156, 160.)  Mr. Gunn told them to

"mak[e] sure that the line is clean and . . . that the parts [are] stocked."  (Pl. Dep. 160.)  Ms.

Brooks does not remember if Mr. Gunn indicated how long beyond the regular shift they

were required to work.  (Pl. Dep. 160.)  What happened next is in dispute, but for present

purposes, Ms. Brooks's account is credited.  Ms. Brooks asked Mr. Gunn if she could leave

work if her area was clean because she needed to attend to a feminine hygiene issue.  (Pl.

Dep. 121, 123, 127, 131-32.)  Mr. Gunn responded, "As long as your area [is] clean, . . . you

can go."  (Pl. Dep. 132; *see also* Pl. Dep. 164-65.)  She left a note for, but did not speak to,

Assistant Manager Phillip Howard ("Howard") that she was leaving because of "female

problems."  (Pl. Dep. 121-23, 129.)  Mr. Howard had worked on the earlier shift[4]; Mr. Akers

was the assistant manager on duty on the second shift on June 7, but Ms. Brooks did not

speak to him either.  (Akers Decl. ¶ 2.)  Ms. Brooks then left the plant, scanning her badge

at 3:03 a.m. to exit the turnstiles.  (Pl. Dep. 139-40, 142-43.)  As evidenced by the time

---

[3] The Team Member Handbook specifies that "[d]ue to the nature of the automotive industry[,] there will be times when we will be required to work overtime in order to meet our customer's needs." (Team Member Handbook 10.)

[4] Ms. Brooks knew that Mr. Howard had worked the earlier shift and was not at the plant at the time when she left the note. (Pl. Dep. 166.)  It was not uncommon, however, for her to leave a note with Mr. Howard about activities occurring on her shift, such as what parts were low or that she had "stocked the backup." (Pl. Dep. 68.)

sheets, Ms. Brooks left the plant at least fifteen minutes earlier than her coworkers in production control.  (Pl. Dep. 150.)

At the end of the required overtime on June 7, Mr. Gunn informed Mr. Akers that Ms. Brooks had left her shift early without permission from HMMA management.  (Akers Decl. ¶ 3.)  Mr. Akers, in turn, reported Ms. Brooks's departure to a member of HMMA's team relations department.  (Akers Decl. ¶ 4.)

The next day on June 7, when Ms. Brooks returned to work, her badge had been deactivated, and she was met by Mr. Howard, Mr. Akers and Mr. Blame.  (Akers Decl. ¶ 5; Pl. Dep. 125-26, 151.)  They advised her that HMMA was conducting an investigation into whether she had abandoned her job by leaving her shift early without permission from HMMA management, in violation of the Attendance Policy.  (Akers Decl. ¶ 5.)

Mr. Gunn was not involved in conducting the investigation.  As part of the investigation, Mr. Blame took statements from Mr. Gunn and Ms. Brooks.  (Blame Decl. ¶¶ 3, 6; Akers Decl. ¶ 5.)  The statements contain conflicting facts surrounding the reason Ms. Brooks requested to leave and whether Mr. Gunn gave Ms. Brooks permission to leave on June 7.  Mr. Gunn reported that, after he informed his team members that they would be working overtime up to an hour,

> [Ms. Brooks] . . . told [him] that she wanted to leave because [her] foot hurt and she was going to see her doctor.  I then told her she needed to go to medical so that she could be excussed [sic] due to her problem.  I then explained that if she left without going to medical that she would be counted as unexcused on the time she did not work.

(Gunn Statement (Ex. 2 to Swegman Decl.).)  Ms. Brooks, on the other hand, reported that

she told Mr. Gunn that she was "having female problems" and that "[a]t that time [Mr. Gunn]

told [her] that [she] could leave."[5]  (Pl. Statement (Ex. 1 to Blame Decl.).)  During the

investigation, "Ms. Brooks admitted that she had never spoken to any member of HMMA

management to obtain permission before leaving the plant" on June 7.  (Blame Decl. ¶ 4.)

"Instead, [she] claimed that she obtained permission from Team Leader Jason Gunn."

(Blame Decl. ¶ 4.)  Ms. Brooks has not disputed these particular declarations by Mr. Blame.

At her deposition, Ms. Brooks conceded that Mr. Gunn is the only HMMA employee who

gave her permission to leave the plant on June 7.  She did not speak to a group leader or a

managerial employee with higher authority, as required in the Attendance Policy.  (Pl. Dep.

165-66.)

    Mr. Blame reported what he had learned from the investigation to Audie Swegman

("Swegman"), the manager of the team relations department.[6]  (Blame Decl. ¶ 7.)  Mr.

Swegman conducted an initial review.  (Swegman Decl. ¶¶ 1, 4.)  He did not speak to Ms.

---

[5] The briefs and the deposition testimony of Ms. Brooks contain substantial discussion and dispute about the reason Ms. Brooks left her shift early.  HMMA points out that leaving the shift early freed Ms. Brooks to ride the 100-mile journey home with two employees with whom she carpooled, but who were not required to work overtime on June 7.  (Pl. Dep. 143-45.)  Ms. Brooks disputes HMMA's characterization, asserting that she and the individuals with whom she carpooled often waited for one another to complete overtime requirements before leaving.  There also is evidence, again disputed by Ms. Brooks, that she sought to leave early because of a foot injury.  Ultimately, as will become apparent, the conflicting facts surrounding the reason Ms. Brooks requested to leave are immaterial to HMMA's determination that Ms. Brooks violated HMMA's Attendance Policy.  Ms. Brooks's reason, as stated, has been credited for summary judgment purposes.

[6] Mr. Blame does not have authority to terminate an employee, and he did not make a recommendation as to whether Ms. Brooks's conduct amounted to job abandonment under HMMA's Attendance Policy.  (Blame Decl. ¶ 7.)

Brooks or any other witnesses, but instead relied upon what was reported to him by Mr. Blame and another team relations specialist (Shawn Flate).  (Swegman Decl. ¶ 4.)  Mr. Swegman reviewed Mr. Gunn's written statement.  Initially, Mr. Swegman thought that Mr. Gunn was a group leader and that, therefore, Ms. Brooks arguably had obtained permission from a manager, in compliance with the Attendance Policy.  (Swegman Decl. ¶ 4.)  Mr. Swegman discussed the matter with Greg Kimble ("Kimble"), HMMA's human resources director.  (Swegman Decl. ¶ 4.)  Based upon their discussions, Mr. Kimble decided to allow Ms. Brooks to return to work.  (Swegman Decl. ¶ 4.)  Mr. Blame called Ms. Brooks and informed her that she could report to work for her shift on the night of June 8, which she did. (Pl. Dep. 152; Akers Decl. ¶ 6.)

A few days after Ms. Brooks had returned to work, Mr. Swegman learned from Mr. Akers that Mr. Gunn was a team leader, not a group leader.  This was a "critical point of distinction," given that team leaders are not members of HMMA management or authorized under the Attendance Policy to excuse team members from their shift. (Swegman Decl. ¶ 5.) Based upon his misunderstanding, Mr. Swegman reevaluated Ms. Brooks's situation and clarified the matter to Mr. Kimble.  Mr. Kimble concluded that, because obtaining permission from a team leader to leave a shift early did not comply with § 4.4.1 of the Attendance Policy, Ms. Brooks should be deemed to have abandoned her job.  On June 14, Ms. Brooks was informed by Mr. Flate that she was being terminated for violating HMMA's Attendance Policy.  (Swegman Decl. ¶ 5; Pl. Dep. 155, 167-69.)

Ms. Brooks has not denied Mr. Gunn's lack of authority under § 4.4.1 of the Attendance Policy to grant a team member permission to leave a shift during scheduled overtime.  In her brief, she argues, however, that she "believed that his permission was all that was needed to allow her to leave" on June 7, "especially since he was the one who had told her to stay and work."  (Pl. Summ. J. Resp. 7 n.1 (Doc. # 20).)  Her deposition testimony is of the same tenor; she admits that on June 7 she "never spoke to anybody above Mr. Gunn before [she] left," but insinuates that there are valid reasons why she only asked Mr. Gunn. (Pl. Dep. 165.)

Ms. Brooks also contends that two Caucasian employees – Darryl Bowling ("Bowling") and Trent Coker ("Coker") – who worked on the "same line," shift, and department as she left their shifts early "[s]everal times" and were not fired.  (Pl. Dep. 149, 155-56.)   According to Ms. Brooks, they left "without permission."   (EEOC Charge (attachment).)  Ms. Brooks cannot recall the "specific time[s]" when they left early.  (Pl. Dep. 157.)

Seeking redress under Title VII and § 1981 against HMMA for racial discrimination, Ms. Brooks filed a charge with the EEOC, which subsequently issued a right-to-sue letter. This timely-filed lawsuit followed on April 29, 2009.  She requests a declaratory judgment, permanent injunction, compensatory and punitive damages, and costs to include attorney's fees.  (Compl. 5.)  After discovery, HMMA moved for summary judgment on all claims.

## V.  DISCUSSION

This is a Title VII and § 1981 discrimination action arising from Ms. Brooks's eleven-month employment with HMMA.  There are two claims at issue: (1) racially discriminatory termination; and (2) racially hostile work environment.[7]  Moving for summary judgment, HMMA contends that Ms. Brooks was terminated for a legitimate non-discriminatory reason – leaving her shift early without permission from management, in violation of HMMA's Attendance Policy – and that there is no evidence that a similarly situated Caucasian employee engaged in comparable misconduct, but was not fired.  Furthermore, HMMA denies the allegations of racial slurs, but asserts that, even if true, the slurs do not amount to severe or pervasive harassment.  Ms. Brooks, on the other hand, contends that genuine issues of material fact abound on both claims.

## A.   <u>Termination</u>

 "A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof."  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008).  Ms. Brooks does not offer statistical evidence.  She argues, however, that direct and circumstantial evidence establishes her racial termination claim.

### 1.   *Direct Evidence*

Direct evidence of discrimination is "'evidence that, if believed, proves [the] existence of [a] fact in issue without inference or presumption.'"  *Wilson v. B/E Aerospace*, *Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125

---

[7] As to the merits, the same analysis applies to claims under Title VII and § 1981.  *See Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002) (Section 1981 and Title VII "have the same requirements of proof and use the same analytical framework.").

F.3d 1390, 1393 (11th Cir. 1997)). "'[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor constitute direct evidence of discrimination." *Id.* (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)). "Remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (internal quotation marks and citation omitted)). Hence, the Eleventh Circuit "require[s] that a biased statement by a decision-maker be made concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily motivated the decision." *Williamson v. Adventist Health Sys./Sunbelt, Inc.*, No. 09-12936, 2010 WL 1444574, at *3 (11th Cir. April 13, 2010); *cf. Holifield v. Reno*, 115 F.3d 1555, 1563-64 (11th Cir. 1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." (internal quotation marks and citation omitted)).

Ms. Brooks argues that Mr. Gunn's racially derogative comments reflect "his opinion of the African-Americans who worked for him and the manner in which they performed their jobs" and are direct evidence of HMMA's "intent to discriminate" against Ms. Brooks on the basis of her race. (Pl. Summ. J. Resp. 12, 13.) HMMA contends, however, that, because Mr. Gunn was not a decision-maker and because the racial epithets were not "related directly" to the termination decision, the racial comments attributed to him do not rise to the level of direct evidence under Eleventh Circuit precedent. (Def. Reply Br. 2 (Doc. # 22).)

15

Ms. Brooks relies on several cases in support of her argument that the racial slurs made by Mr. Gunn are direct evidence. (Pl. Summ. J. Resp. 12-13.) In *Haynes v. W.C. Caye & Co.*, 52 F.3d 928 (11th Cir. 1995), for example, the company's male president created a new position to oversee collections. *See id.* at 930. Responding to a recommendation that a female employee be placed in this position, he questioned whether a woman was "tough enough to do the job" and whether the duties "would require a man to do the job." *Id.* The Eleventh Circuit concluded that these statements were "indistinguishable" from those in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), that were deemed direct evidence of gender discrimination. In *Price*, "one partner repeatedly commented that he could not consider any woman seriously as a partnership candidate and believed that women were not even capable of functioning as senior managers." *Haynes*, 52 F.3d at 930 (quoting *Price Waterhouse*, 490 U.S. at 236). Hence, under binding precedent, the Eleventh Circuit held that the company president's statements were direct evidence of discriminatory intent with respect to the plaintiff's Title VII sex discrimination claim challenging her removal from the position. *Id.*

In *EEOC v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir. 1990), the plaintiff brought a Title VII claim that he was not promoted on the basis of his race. There was testimony that the plant's general manager had said that, "if it was his company[,] he wouldn't hire any black people." *Id.* at 923. Because the general manager was a "decisionmaker, and he made the remark in reference to hiring," his statement was direct evidence of discrimination. *Id.* at 924. And, in *EEOC v. Beverage Canners, Inc.*, 897 F.2d

16

1067 (11th Cir. 1990), the Eleventh Circuit held that the "overwhelming evidence" of a constant barrage of racially derogatory remarks by those responsible for employment decisions was direct evidence that the plaintiff was denied employment because of her race. *Id.* at 1072; *see also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997) (The decision-maker's statement – "[y]our deposition was the most damning to [the employer's] case, and you no longer have a place here at Dillard Paper Company" – was direct evidence of retaliation) (collecting direct evidence cases).

Each of these cases cited by Ms. Brooks is distinguishable because a decision-maker made the statement demonstrating unlawful bias against the plaintiff concerning the adverse employment action at issue. Here, Mr. Gunn did not make the decision to fire her; Mr. Kimble did.[8] The evidence stands unrebutted that the final decision-maker was Mr. Kimble, and there is no direct evidence of racial bias on his part.

Notwithstanding the absence of evidence that Mr. Gunn was not the decision-maker, Ms. Brooks argues that Mr. Gunn's racial biases nonetheless should be imputed to HMMA

---

[8] While Ms. Brooks does not contend that Mr. Gunn made the decision to fire hire, she asserts in general terms that Mr. Gunn was her supervisor. (Pl. Summ. J. Resp. 3.) In support of her argument, she submits HMMA's Position Description for a Team Member. (Pl. Ex. 1 to Doc. # 21.) It provides in the heading that a team member "reports to" a team leader, but that undefined phrase reveals little, if anything, about the degree of authority a team leader has over a team member with respect to employment decisions. The Position Description does not contain any language indicating or suggesting that a team leader can hire, fire, discipline or excuse a team member from finishing his or her shift, and Ms. Brooks has not argued that Mr. Gunn possessed such authority. (Pl. Summ. J. Resp. 3.) The evidence, thus, stands unrebutted that a team leader "has no authority to promote, discipline or terminate Team Members" (Blame Decl. ¶ 4), and no "authority under HMMA policy to grant permission for employees to leave their shift early" (Akers Decl. ¶ 3). (*See also* Swegman Decl. ¶ 6 ("[A] Team Leader is not a member of HMMA management and has no authority to hire, promote, evaluate, discipline or terminate Team Members.").)

under a cat's paw theory.  She points out that Mr. Gunn got the ball rolling toward her termination.  That is, he is the one who told Assistant Manager Akers that she left the plant without completing her scheduled overtime and without managerial permission:  "[I]f [Mr.] Gunn had never reported [Ms. Brooks,] then she would not have lost her job."  (Pl. Summ. J. Resp. 14.)  Ms. Brooks also says that Mr. Gunn reduced to writing the facts that ultimately were used as the basis for her termination, and that Mr. Blame credited Mr. Gunn's written statement, having full knowledge of Mr. Gunn's prior use of racial epithets (as previously reported to him by Ms. Brooks).  Based on these facts, Ms. Brooks argues that under a cat's paw theory, Mr. Kimble was manipulated by Mr. Gunn's report of her misconduct and that Mr. Gunn's racial biases tainted the decision to terminate Ms. Brooks.  (Pl. Summ. J.  Resp. 16.)

HMMA argues, on the other hand, that cat's paw liability requires "actual proof that the subordinate made a recommendation that was followed by the decisionmaker," and that Mr. Gunn did not make a recommendation that Ms. Brooks be fired, but merely related facts. (Def. Reply Br. 4.)   HMMA also contends that, even if Mr. Gunn had made a recommendation, there was an independent factual investigation that ultimately was relied upon by Mr. Kimble.  Furthermore, because Ms. Brooks has "admitted that she never spoke to any Group Leader or other member of HMMA management before leaving the facility" on June 7, HMMA contends that neither Mr. Kimble nor Mr. Swegman "need[ed] to rely" on Mr. Gunn's statement to reach a decision.  (Def. Reply Br. 5.)

18

The cat's paw theory applies where an employee demonstrates that "the decisionmaker followed the biased recommendation [of a non-decision-maker] without independently investigating the complaint against the employee." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).  In that instance, "the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.*  Causation between the recommender's discriminatory animus and the adverse employment action, however, "must be truly direct." *Id.*  The "discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, [must be] an actual cause of the other party's decision to terminate the employee." *Id.*

In *Stimpson*, the City of Tuscaloosa's chief of police lacked the authority to unilaterally fire an officer; however, he recommended to the Civil Service Board of Tuscaloosa ("Board") that the officer-plaintiff be terminated and informed the plaintiff of his intent to make that recommendation to the Board. *See* 186 F.3d at 1330.  After receiving the chief's recommendation, the Board held a three-day hearing at which the officer, through counsel, introduced evidence and put on witnesses.  Because it was "hard to imagine any other procedural device that would ensure a more fair and independent decision than that of the . . . Board," the Eleventh Circuit opined that it was unnecessary to its decision to "announce a bright line at which an independent investigation becomes a rubber stamp." *Id.* at 1332.  There was no "hint of a cat's paw arrangement" and insufficient evidence of

19

causation between the Board's termination decision and the chief of police's alleged discriminatory animus. *Id.*

Stimpson makes clear that a truly independent determination by the decision-maker to fire an employee defeats a cat's paw theory of liability, but it does not provide insight as to how much influence a biased subordinate must have over the decision-maker before the decision will be deemed no longer independent. In *Dwyer v. Ethan Allen Retail, Inc.*, 325 F. App'x 755 (11th Cir. 2009), however, evidence that the allegedly biased subordinate "made no recommendation to [the decision-maker] about the course of action to take on [the plaintiff]" was an additional fact "show[ing] the independent nature of [the decision-maker's] investigation." *Id.* at 758. On the other hand, sufficient manipulation by the decision-maker may exist where the biased subordinate passes on "false information to the decisionmaker[]." *Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.20 (11th Cir. 1999).

Here, unlike *Stimpson*, but like *Dwyer*, there is no evidence that Mr. Gunn made a recommendation that Ms. Brooks be fired. The evidence establishes merely that Mr. Gunn notified the assistant manager on duty (Mr. Akers) that Ms. Brooks left her shift early, and that, during the investigation, he provided a written statement documenting his account of the conversation between Ms. Brooks and him on June 7. It is true that the decision-maker (Mr. Kimble), as well as Mr. Swegman, reviewed Mr. Gunn's written statement, but neither that statement nor the email from Mr. Gunn to Mr. Blame (to which the statement is attached) included any recommendation for discipline against Ms. Brooks. (Def. Summ. J. Br., Ex.

B1.)  The absence of such evidence weighs against Ms. Brooks's argument that Mr. Gunn's

alleged discriminatory animus influenced Mr. Kimble's decision to terminate her.[9]

Ms. Brooks also has not presented any evidence that the critical fact underlying Mr.

Kimble's decision to fire her is untrue.  Mr. Kimble, the racially neutral decision-maker,

based his decision to fire Ms. Brooks on information he received from Mr. Swegman that

Ms. Brooks left the plant before the end of scheduled overtime without obtaining permission

from a manager designated in HMMA's Attendance Policy.  (Swegman Decl. ¶ 4.)  The

conclusion reached was that it was insufficient under the Attendance Policy to "speak to a

Team Leader to obtain permission to leave the plant."  (Swegman Decl. ¶ 4.)  Ms. Brooks

admitted during the investigation, and has never disputed, that Mr. Gunn was the only

individual who told her it was okay to leave the plant on June 7.  (Swegman Decl. ¶ 4; Blame

Decl. ¶ 4; Pl. Dep. 165-66.)  Ms. Brooks's admission of a culpable fact to HMMA's racially

neutral managers[10] (Blame ¶ 4), and Mr. Blame's reporting of this fact to Mr. Swegman

(Blame Decl. ¶ 7; Swegman Decl. ¶ 4), who "reviewed th[e] information" with Mr. Kimble

(the decision-maker) (Swegman Decl. ¶ 4), were not dependent upon and did not involve Mr.

Gunn or his statement.  Ms. Brooks cites no authority, and none has been found, that would

---

[9] It is notable that, even if the evidence established that Mr. Gunn had recommended termination, that recommendation initially was not adopted.  That is, Mr. Kimble allowed Ms. Brooks to return to work based upon his review of the investigation, including Mr. Gunn's statement, and his mistaken belief that Mr. Gunn was a group leader.  (Swegman Decl. ¶¶ 2, 4-5.)  Indeed, it was Mr. Akers, not Mr. Gunn, who asked Mr. Swegman why Ms. Brooks "had been allowed to return to work" and informed Mr. Swegman that Mr. Gunn was merely a team leader, not a group leader.  (Akers Decl. ¶ 6.)

[10] Ms. Brooks does not contend that any of the individuals involved in the investigation of her alleged misconduct made racially derogatory comments or otherwise harbored racial animus.  (Pl. Dep. 170 (confirming that "[n]obody but Jason [Gunn]" subjected her to racially harassing behavior).)

support a finding that Mr. Gunn tainted the decision-making process when she admitted during the investigation to undisputedly racially neutral investigators of the fact that led to her termination.

Also unpersuasive is Ms. Brooks's argument that cat's paw liability is established because Mr. Gunn's statement was the catalyst for the investigation, *i.e.*, but for Mr. Gunn's statement, no management official would have known of the infraction. This connection is far too attenuated to establish causation under a cat's paw analysis, particularly given Ms. Brooks's admission and the independent investigation conducted by racially neutral HMMA management officials. In short, Ms. Brooks's cat's paw argument cannot save her direct evidence claim.

In sum, even if Mr. Gunn's stigmatizing racial epithets indicate a desire by him to fire Ms. Brooks because of her race, his lack of involvement in Ms. Brooks's termination means that such evidence is not direct. This simply is not a direct evidence case.

### 2.   *Circumstantial Evidence*

Lacking direct evidence, Ms. Brooks must prove her discrimination claim circumstantially, using the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Wilson*, 376 F.3d at 1087. Under that framework "a plaintiff first must show an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination." *Brooks v. Cnty. Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006). Once a plaintiff establishes a *prima facie* case, the burden

shifts to the employer "to 'articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer meets its burden, the burden shifts back to the plaintiff to show that the employer's stated reason for the adverse employment action was a "pretext" for discrimination. *Id.* The pretext inquiry requires a determination, based upon the totality of the evidence, as to whether the plaintiff "'has cast sufficient doubt on the defendant's proffered nondiscriminatory reason[] to permit a reasonable factfinder to conclude that the employer's proffered legitimate reason[] [was] not what actually motivated its conduct.'" *Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

### a.   *Prima Facie* Case

On this record, a *prima facie* case of discriminatory termination is contingent upon evidence that "(1) that the plaintiff belongs to a class protected under Title VII; (2) that the plaintiff was qualified for the job; and (3) that the misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly." *Latham v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 792 (11th Cir. 1999).

The sole issue as to the *prima facie* case is whether Ms. Brooks has identified a similarly situated person outside the protected class who was not terminated for a comparable infraction. Ms. Brooks must show that a Caucasian employee was "involved in or accused of the same or similar conduct and [was] disciplined in [a] different way[]." *Holifield*, 115

F.3d at 1562.  In other words, the Caucasian employee must be "similarly situated in all relevant respects."  *Id.*  The Eleventh Circuit has interpreted this standard to "require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

Ms. Brooks offers two Caucasian comparators, Mr. Bowling and Mr. Coker, who worked on the "same line" and shift and in the same department as she.  They allegedly left their shifts early "[s]everal times" (Pl. Dep. 149) and "without permission" (EEOC Charge 2).  HMMA argues that Mr. Bowling and Mr. Coker are not valid comparators for three reasons.  First, HMMA contends that Ms. Brooks has not presented any evidence that an HMMA manager was aware of Mr. Bowling's and Mr. Coker's alleged unexcused early departures.  (Def. Summ. J. Br. 16 (citing Pl. Dep. 157-58).)  HMMA argues that an employee who breaks a rule, but is not caught, is not similarly situated to one who has been caught.  (Def. Summ. Br. 16 (citing *Bogle v. Orange Cnty. Bd. of County Comm'rs*, 162 F.3d 653, 658-59 (11th Cir. 1998).)  Second, HMMA points out that, during the investigation, Ms. Brooks did not dispute that she violated the terms of HMMA's Attendance Policy, but that there is no corresponding evidence that Mr. Bowling and Mr. Coker admitted committing a similar infraction.  (Def. Summ. J. Br. 16 (citing Pl. Dep. 165-66).)  Third, HMMA contends that Ms. Brooks's assertion that Mr. Bowling and Mr. Coker left "without permission" lacks a foundation showing personal knowledge and is speculative and, thus, is not competent summary judgment evidence.  (Def. Reply Br. 7 (citing Pl. Dep. 157-58).)

Ms. Brooks responds only to HMMA's first argument.[11]  The problem for Ms. Brooks is that HMMA's second argument is dispositive, and she offers no rebuttal.  *Abel v. Dubberly*, 210 F.3d 1334 (11th Cir. 2000), relied upon by HMMA, is instructive.  In *Abel*, the plaintiff-employee admitted using $10.00 from the county library's cash register to buy gas for her personal vehicle.  After she was fired for misusing county funds, the plaintiff filed a Title VII lawsuit, alleging that the real reason she was fired was because of her race.  The Eleventh Circuit held that there was a "key difference" between the plaintiff and the purported comparator:  The comparator "never confessed to taking county funds for personal use; at worst, [she] . . . admitted to temporarily misplacing funds."  *Id.* at 1339.  The plaintiff "did not offer any evidence sufficient to show that she was similarly situated to any other employee, and absent some other similarly situated but differently disciplined worker, there can be no disparate treatment."  *Id.*

*Abel* mandates the same outcome in this case.  As already discussed, Ms. Brooks admitted during the investigation that Mr. Gunn was the only HMMA employee who gave her permission to leave the plant on June 7.  She did not speak to a group leader or a managerial employee with higher authority, as required by the Attendance Policy.  (Pl. Dep. 165-66.)  Ms. Brooks has not presented any evidence, however, that either Mr. Bowling or Mr. Coker admitted leaving their shifts early without obtaining permission from a manager

---

[11] Her response is that Mr. Gunn "would have notice[d]" Mr. Bowling's and Mr. Coker's disappearance, but he did not "turn them in"; therefore, Mr. Gunn treated her more harshly than he treated Mr. Bowling and Mr. Coker.  (Pl. Summ. J. Resp. 17.)  Ms. Brooks's argument focuses primarily on the disparity in Mr. Gunn's *treatment* of her as compared to his *treatment* of Mr. Bowling and Mr. Coker, while HMMA focuses on differences in the *misconduct*.

designated in HMMA's Attendance Policy.  She also has not made any attempt to distinguish, or even mentioned, the facts in *Abel*.  Ms. Brooks's admission during the investigation of the sole fact upon which her termination was based presents the determinative distinction between Ms. Brooks and her two would-be comparators: Ms. Brooks's misconduct is not comparable to Mr. Bowling's and Mr. Coker's misconduct.

For this reason, Ms. Brooks has not shown that Mr. Bowling and Mr. Coker are similarly situated Caucasian employees.  Having failed to point to a similarly situated Caucasian employee, Ms. Brooks cannot establish a *prima facie* case under *McDonnell Douglas*.  *See Maniccia*, 171 F.3d at 1369 (affirming summary judgment in favor of the employer on a gender disparate treatment claim because the employee "failed to meet her burden of pointing to a male employee who engaged in the same or similar misconduct").  Accordingly, HMMA's motion for summary judgment on Ms. Brooks's Title VII/§ 1981 racially discriminatory termination claim is due to be granted.

### b.   Legitimate, Nondiscriminatory Reason for Termination

Even if one assumes that Ms. Brooks establishes a *prima facie* case, HMMA has "clearly set forth, through the introduction of admissible evidence" a legitimate, nondiscriminatory reason for Ms. Brooks's termination.  *Burdine*, 450 U.S. at 255.  An employer's honest belief (even if erroneous) that an employee violated a work rule constitutes a legitimate, nondiscriminatory reason for firing an employee. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).  And, "[a]dmission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct."

*Jones*, 874 F.2d at 1540; *see also Abel*, 210 F.3d at 1339 ("Abel's admission that she took the money rebuts any prima facie case of discrimination.").

HMMA contends that Ms. Brooks was fired for violating its Attendance Policy, which mandates that, in "[a]ny situation" where a team member leaves the plant during scheduled overtime without permission from a group leader or higher managerial official, "the Team Member will be considered to have voluntarily resigned from his/her employment at HMMA." (Attendance Policy § 4.4.1.) Again, Ms. Brooks admitted during the investigation that she left the facility on June 7 with Mr. Gunn's approval. Mr. Kimball determined that leaving only with the permission of a team leader (Mr. Gunn) violated § 4.4.1 and warranted Ms. Brooks's termination. This reason is legitimate. It also is supported by competent evidence.

### c.   Pretext

Continuing the assumption of the existence of a *prima facie* case, the burden shifts to Ms. Brooks to "meet [the proffered] reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Ms. Brooks argues primarily that the racial epithets spoken by Mr. Gunn and the "preferential treatment" allegedly received by Mr. Bowling and Mr. Coker demonstrate that HMMA's proffered reason for her termination is pretextual.[12] (Pl. Summ. J. Resp. 17.) The court disagrees.

---

[12] Ms. Brooks's argument that Mr. Gunn's racial slurs are direct evidence has been rejected. Ms. Brooks alternatively relies on this same evidence as proof, under a circumstantial case analysis, that HMMA's proffered non-discriminatory reason was pretextual.

27

First, it is true that, if Mr. Gunn had been involved in the decision to terminate Ms. Brooks, his inappropriate and offensive racial slurs may have aided "a circumstantial case for pretext." *Scott v. Suncoast Beverage Sales*, 295 F.3d 1223, 1229 (11th Cir. 2002); *see also Rojas*, 285 F.3d at 1343 (A supervisor's discriminatory remarks that are "isolated and unrelated to the challenged employment decision," although not direct evidence, "can contribute to a circumstantial case for pretext."). Because he was not, Mr. Gunn's racial slurs, although certainly not condoned, cannot on this record serve to create a jury issue on pretext.

Second, as discussed, the *prima facie* case fails because Mr. Bowling and Mr. Coker are not similarly situated to Ms. Brooks. No additional analysis is required at the pretext stage.

Third, Ms. Brooks contends that Mr. Gunn deviated from the Attendance Policy by not reporting Mr. Bowling and Mr. Coker for leaving their shifts early without permission, but reporting her. (Pl. Summ. J. Resp. 17.) "The bending of established rules may, of course, be suggestive of discrimination." *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002). To raise a genuine issue of material fact, Ms. Brooks must come forward with "specific facts" to support her argument. Fed. R. Civ. P. 56(e); *see also Holifield*, 115 F.3d at 1564 n.6 (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment.").

Relying on her deposition testimony, Ms. Brooks contends that Mr. Bowling and Mr. Coker left early and "without permission." (Pl. Summ. J. Resp. 7, 18 (citing Pl. Dep.

155-56).)  What is missing in that testimony are specific facts, or any facts, to support her assertion that they left "without permission."  (Pl. Dep. 156-57.)  Her EEOC charge is similarly conclusory and unexplained.  (EEOC Charge 2.) Did they leave without permission from Mr. Gunn?  If so, that fact would be appear to be immaterial in that Mr. Gunn was not authorized under the Attendance Policy to grant such permission.  Ms. Brooks fails to articulate any factual basis that would tend to show that she had personal knowledge that Mr. Bowling and Mr. Coker had not obtained permission from a managerial employee designated in the Attendance Policy.  Ms. Brooks's conclusory assertion that her coworkers left "without permission" as evidence of pretext is insufficient to meet her burden.

Fourth, Ms. Brooks emphasizes her beliefs that Mr. Gunn's permission to leave on June 7 should have sufficed and that she had completed the end-of-the-shift inventory task required of her.  (Pl. Summ. J. Resp. 5-6, & 7 n.1.)  In other words, she believes that she was justified in leaving work on June 7 when she did.  Her beliefs, however, are irrelevant.  As pronounced by the Eleventh Circuit, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's belief, and to be blunt about it, not on reality as it exists outside of the decision maker's head."  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).  Adverse employment decisions may seem harsh, unfair or even objectively unreasonable, but the federal anti-discrimination laws do not protect an employee from such actions.  *Id.*

Fifth, lest the forest be lost for the trees, the focus of the pretext inquiry must remain on the participants in the decision-making process.  *See Jones*, 874 F.2d at 1541 & n.13.

Under a broad net, those participants were Mr. Blame, Mr. Akers, Mr. Swegman and Mr. Kimble. The issue is whether these individuals honestly believed that Ms. Brooks had violated the Attendance Policy and, if so, whether their belief was the reason for the termination. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 & n.2 (11th Cir.1991). Again, an investigation was conducted and that investigation resulted in a concession from Ms. Brooks that she left the HMMA plant on June 7 without receiving permission from a manager designated in the Attendance Policy. There is no evidence that brings into question HMMA's asserted belief that Ms. Brooks's concession amounted to a violation of the Attendance Policy and, thus, was tantamount to a voluntary resignation. (Attendance Policy § 4.4.1.) There also is no evidence that Mr. Kimble – the final decisionmaker – or even Mr. Blame, Mr. Akers or Mr. Swegman received similar information that a Caucasian worker engaged in similar misconduct, but was not terminated under the Attendance Policy.

In sum, Ms. Brooks has not raised a genuine issue of material fact as to the true reason she was fired or that unlawful discriminatory animus motivated the decision. In the end, Ms. Brooks merely disagrees with HMMA's application of its Attendance Policy to her admitted conduct. On this record, there is no evidence that HMMA's reason for terminating Ms. Brooks lacks plausibility, and the court's second-guessing of the decision to terminate her is prohibited. *See Elrod*, 939 F.2d at 1470. Accordingly, Ms. Brooks fails to raise a genuine issue of material fact on pretext. The absence of evidence of pretext provides an additional reason for granting HMMA's motion for summary judgment on Ms. Brooks's racially discriminatory termination claim.

**B.      Hostile Work Environment**

To establish a claim of hostile work environment under Title VII and § 1981, Ms. Brooks must show:  (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment was based on her race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that the employer is responsible for such environment.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Only element four is at issue.  HMMA contends that Ms. Brooks did not suffer harassment that was sufficiently severe or pervasive to alter the terms and conditions of her employment.

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive."  *Miller*, 277 F.3d at 1276 (internal citation and quotation marks omitted).  To determine the objective severity of the workplace harassment, the court must look to "all the circumstances" surrounding the plaintiff's employment, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating . . . ; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).  Title VII is not a "general civility code."  *Faragher*, 524 U.S. at 788; thus, "'mere utterance of an . . . epithet

which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII," *Harris*, 510 U.S. at 21.

The issue is whether Mr. Gunn's racial slurs directed toward Ms. Brooks qualify as actionable harassment under the fourth element of the test.  Testimony that Mr. Gunn used racial epithets "more than one time" (Pl. Dep. 76) or "often" (EEOC Charge) is vague and conclusory and, thus, not competent evidence for establishing frequency.  *See Godoy v. Habersham Cnty.*, 211 F. App'x 850, 854 (11th Cir. 2006) ("The employee must present concrete evidence in the form of specific facts, not just conclusory allegations and assertions." (hostile work environment case)); *Buckhanon v. Huff & Assocs. Constr. Co.*, 506 F. Supp. 2d 958, 966 n.5 (M.D. Ala. 2007) (To hurdle summary judgment, "plaintiffs must point to specific instances of racial hostility, and not offer mere conclusory allegations." (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)).

There are, however, two specific incidents about which Ms. Brooks testified during her deposition.  In both incidents, Mr. Gunn responded to Ms. Brooks's request for more parts to stock the line, by grumbling, "black folks, I'll tell you" and  "niggers."  (Pl. Dep. 74, 76, 90, 104-06, 198.)   No doubt these epithets are offensive and unacceptable in the workplace.  Under Eleventh Circuit law, however, two incidents occurring over a four- or six-month span are not sufficiently frequent for purposes of substantiating a hostile work environment claim.  *Compare Beverage Canners*, 897 F.2d at 1070 (Daily racial slurs used by a plant manager within a one-month time frame rose to the level of a Title VII violation.), *and Miller*, 277 F.3d 1269 (Sufficient evidence was presented at trial to establish slurs by

32

supervisor were frequent when used three to four times a day.), *with McCann v. Tillman*, 526 F.3d 1370, 1378-79 (11th Cir. 2008) (Supervisor's reference to African-American plaintiff as "girl" and African-American coworkers as "boys," and coworker's use (at least twice, but "out of [the plaintiff's] hearing") of an offensive racial epithet over a period of more than two years, "[a]lthough offensive, . . . [were] too sporadic and isolated to establish that her employers' conduct was so objectively severe and pervasive as to alter the terms and conditions of her employment."), *Mahgoub v. Miami Dade Cmty. Coll.*, No. 04-20039, 2006 WL 952278, at *1 (11th Cir. April 13, 2006) (Four specific instances "involving offensive utterances and one accompanied by a threatening physical gesture, over unspecified time" was insufficient evidence of a hostile work environment to withstand summary judgment.), *and Mosley v. Meristar Mgmt. Co., L.L.C.*, 137 F. App'x 248, 252 & n.3 (11th Cir. 2005) (The plaintiff's hostile work environment could not survive summary judgment based upon "two isolated incidents of racial slurs."). *See also Buckhanon*, 506 F. Supp. 2d at 966 ("Three instances of derogatory language in a two month period does not rise to the level of frequency found actionable in Eleventh Circuit precedent.").

The evidence also is lacking in severity. "Harassing conduct is severe when it causes the employee's workplace to become 'permeated with discriminatory intimidation, ridicule, and insult.'" *Buchanon*, 506 F. Supp. 2d at 96-67 (citation and internal quotation marks omitted). Two instances over an eleven-month period do not create a workplace that is permeated with discriminatory intimidation.

There also is no evidence that Mr. Gunn's comments were accompanied by express or implied threats of physical harm, or that Ms. Brooks felt threatened.  There is testimony, however, that Ms. Brooks sensed that Mr. Gunn made the comments for the purpose of conveying that she was incapable of effectively performing her job because of her race (Pl. Dep. 74, 76, 90, 198), and that she reported the slurs to the team relations department (Pl. Dep. 69-74, 77-80, 88-90, 102).  This testimony is indicative of humiliation felt by Ms. Brooks.

Finally, Ms. Brooks testified that Mr. Gunn's comments "didn't affect" her ability to perform her job duties satisfactorily, and that she believes that she could work with Mr. Gunn again.  (Pl. Dep. 196-97.)  Her testimony is similar to the plaintiff's in *McCann*: "[A]lthough [the plaintiff] alleges that she was upset by th[e racially derogative workplace] language, she has not demonstrated that the alleged environment interfered with her job performance.  In fact, [the plaintiff] actually testified that it did not affect her work."  526 F.3d at 1379.

Overall, although there is evidence that Mr. Gunn's racial slurs were humiliating, there is an absence of evidence that the slurs were frequent, severe or physically threatening, or that they interfered with Ms. Brooks's work performance.  Having considered the totality of the circumstances, the court finds that Ms. Brooks has failed to raise a genuine issue of material fact that she was subjected to racial harassment that objectively altered the terms or conditions of her employment.[13]  Accordingly, Ms. Brooks has not established a *prima facie*

---

[13] Because Mr. Gunn's comments are legally insufficient to create a hostile work environment, it is unnecessary to consider HMMA's alleged inadequate response to Ms. Brooks's complaints to Mr. Blame and his predecessor (the fifth element).

case of hostile work environment based on race, and HMMA's motion for summary judgment on this claim is due to be granted.

## VI.  CONCLUSION

Ms. Brooks has not demonstrated a genuine issue of material fact sufficient to establish a *prima facie* case of disparate treatment in her termination or that her termination was a pretext for race discrimination.  The evidence also is insufficient to create a genuine issue of material fact that Mr. Gunn's conduct was sufficiently severe or pervasive to create a hostile work environment.  Accordingly, it is ORDERED that HMMA's motion for summary judgment (Doc. # 14) is GRANTED.

A separate judgment will be entered.

DONE this 8th day of September, 2010.


_____/s/ W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE